1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON

# SEATTLE DIVISION

8
9
10
11

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. |
| Plaintiff, | **COMPLAINT** <br> JURY DEMAND |
| v. | |
| JUSTIN COSTELLO and DAVID FERRARO | |
| Defendants. | |

12
13
14
15
16
17
18

19    Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission"), for its

20 complaint against Defendants Justin Costello ("Costello") and David Ferraro ("Ferraro") alleges

21 as follows:

22
23
24

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

## SUMMARY

1.      This action involves Costello's numerous schemes to defraud investors, all of which violated the antifraud provisions of the federal securities laws. Costello, who claimed to be building a conglomerate in the cannabis industry, falsely portrayed himself to the public as a billionaire with a Harvard MBA, a military veteran, and a hedge fund manager with years of experience on Wall Street. Between at least July 2019 and August 2020, Costello used these and other fictitious credentials to gain investors' trust and to defraud them out of millions of dollars.

2.      First, Costello disseminated materially false or misleading information about his educational and professional credentials to the investing public, including in a Commission filing for GRN Holding Corporation Nevada ("GRNF"), a publicly traded microcap company of which Costello was CEO. In a press release for GRNF, Costello also disseminated materially false or misleading information about a purported banking entity that Costello owned and that GRNF would allegedly acquire.

3.      Second, after using his fabricated accomplishments to become an investment adviser to a married couple, Costello sold the couple $1.8 million in stock at an over 9,000 percent markup without adequately disclosing the markup to them. Costello further used the same advisory clients' $4 million brokerage account to trade securities of companies in which he had an undisclosed financial interest and to conduct insider trading.

4.      Third, Costello obtained approximately $700,000 in investments from 13 investors for a closely-held company that shared a name with GRNF but that was in fact a separate, private entity owned and controlled by Costello.  As a result of Costello's materially false or misleading statements, investors were led to believe that they were buying shares of GRNF, and not shares of the private entity.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

5.     Fourth, Costello obtained approximately $200,000 in investments from 19 investors for a private company that Costello purportedly planned to turn into a publicly traded cannabis-related company. Certain of the investors attended a presentation during which Costello again emphasized his false professional credentials, including his purported experience as an investment banker in the cannabis industry. In addition, for at least $50,000 of the investments in the private company, Costello misappropriated the funds by depositing them in an account for yet a different company that Costello controlled.

6.     Fifth, from at least October 2019 through January 2021 Costello and Ferraro engaged in stock promotion schemes in which Ferraro recommended to his Twitter followers and the public at least five microcap stocks that Costello owned. Ferraro failed to disclose that he and Costello intended to sell shares of those stocks as the price of those stocks rose, or that Costello would pay Ferraro a portion of his profits from those sales. Costello profited approximately $683,000 from these schemes, of which he shared approximately $32,000 with Ferraro. Ferraro profited approximately $41,000 from his own trading in these schemes.

7.     Additionally, in July 2019, December 2019, and January 2020, Ferraro separately conducted his own stock promotion schemes with respect to two additional microcap stocks, generating profits of approximately $68,000.

## VIOLATIONS

8.     By engaging in the conduct set forth in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10-b5]. Costello further violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

1    9.    Unless the Defendants are permanently restrained and enjoined, they will

2    continue to engage in the acts, practices, and courses of business set forth in this Complaint and

3    in acts, practices, and courses of business of similar type and object.

4    **NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

5    10.    The Commission brings this action pursuant to the authority conferred upon it by

6    Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15

7    U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

8    11.    The Commission seeks a final judgment: 1) permanently enjoining the Defendants

9    from ongoing or future violations of the federal securities laws and rules this Complaint alleges

10   they have violated; 2) ordering the Defendants to disgorge all ill-gotten gains they received as a

11   result of the violations alleged herein and to pay prejudgment interest thereon pursuant to

12   Sections 21(d)(3) [15 U.S.C. § 78u(d)(3)], 21(d)(5) [15 U.S.C. § 78u(d)(5)], and 21(d)(7) [15

13   U.S.C. § 78u(d)(7)] of the Exchange Act; 3) ordering the Defendants to pay civil money

14   penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of

15   the Exchange Act [15 U.S.C. § 78u(d)(3)], and, as to Costello, also Section 21A of the Exchange

16   Act [15 U.S.C. §§ 78u-1(a)(1)-(2)] and Section 209(e) of the Advisers Act [15 U.S.C.§ 80b-

17   9(e)]; 4) prohibiting the Defendants from participating in any offering of a penny stock, pursuant

18   to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15

19   U.S.C. § 78u(d)(6)]; 5) prohibiting Costello from serving as an officer or director of any public

20   company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21   21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and 6) ordering any further relief that the

22   Court may deem just and proper.

23

24

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Sections 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

13.     The Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Among other things, Costello made certain of the false statements described herein, and placed certain of the trades described herein, while physically present in this District. Costello also made certain transfers to Ferraro from bank accounts owned by entities located in this District and engaged in stock promotion schemes with Ferraro while within this District.

## DEFENDANTS

15.     **Costello**, age 42, currently resides in La Jolla, California. Until August 2022, Costello was the CEO and sole Director of GRNF. Costello also was the Chairman of Hempstract Inc. ("Hempstract") until May 2021. Costello is the majority shareholder of GRN Holding Corporation Washington ("GRN Holding (WA)") and is the sole owner of GRN Funds, LLC ("GRN Funds"). Costello is not registered with the Commission as a broker or an investment adviser.

16.     **Ferraro**, age 44, is a resident of Radford, VA. During the time period of the stock promotion schemes described herein, Ferraro controlled a Twitter account under the handle

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

"@computerbux," which had nearly 10,000 followers as of December 2019. Ferraro is currently employed as a "Business Transformation Consultant."

## OTHER RELEVANT ENTITIES

17. **GRN Funds** is a Washington limited liability company that is wholly owned by Costello. GRN Funds purports to be a private equity and capital management company. It also purports to provide banking services to marijuana-related businesses through a Costello-owned entity formerly known as Pacific Banking Company and now known as Pacific Compliance Corporation.

18. **GRNF** is a Nevada corporation that, until June 2022, had its principal executive offices in Seattle, Washington. Its common stock is quoted publicly under the ticker symbol "GRNF" on OTC Link, an exchange through which over-the-counter securities are traded. Until August 19, 2019, GRNF was named Discovery Gold Corporation.

19. **GRN Holding (WA)** is a Washington corporation with its principal executive offices in Seattle, Washington. GRN Holding (WA) is a private company founded by Costello and of which Costello is its largest shareholder and CEO.

20. **Hempstract** is a Nevada corporation with its principal executive offices in Warden, Washington. The company purports to develop and sell hemp-based products. Costello was one of the initial founders of Hempstract, which became a publicly traded company after it was acquired by Riverdale Oil and Gas Corporation ("RVDO") in August 2020. Today, it is quoted on OTC Link under the ticker symbol "HPST."

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

# FACTS

## I. Costello Made False and Misleading Statements to the Investing Public, Including in a Form 8-K and in a Press Release

21. On June 20, 2019, Costello, through GRN Funds, acquired 139 million shares—a majority interest—of GRNF. At the time, the company was named Discovery Gold Corporation.

22. Costello purportedly planned to turn GRNF into a cannabis conglomerate by merging companies in the cannabis industry into GRNF.

23. On July 1, 2019, GRNF filed a Form 8-K announcing Costello's purchase of GRNF shares and his appointment as President, CEO, and sole Director of GRNF.

24. The Form 8-K stated that Costello was a graduate of the University of Minnesota and the Harvard Business School.

25. The Form 8-K also stated that Costello was the CEO of GRN Funds and described GRN Funds as a "private equity and hedge fund."

26. Contrary to these representations, Costello graduated from Winona State University, and not the University of Minnesota.

27. Costello did not graduate from Harvard Business School. Costello has taken just one class through Harvard University's Division of Continuing Education.

28. GRN Funds has never been registered with the Commission as a hedge fund.

29. Costello knew that he was not a graduate of the University of Minnesota or Harvard Business School. Costello also knew that GRN Funds was not a hedge fund.

30. Costello signed GRNF's July 1, 2019 Form 8-K containing these false representations.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

31.    The July 1, 2019 Form 8-K and accompanying press release were issued after trading hours that day. On July 2, 2019, GRNF share prices increased from $0.0028 to $0.03—a 971 percent increase—on trading volume 400 times that of the prior day.

32.    Around the time GRNF filed the July 1, 2019 Form 8-K, GRN Funds's website stated that it had $1.15 billion in assets under management. This statement was false.

33.    On November 12, 2019, GRNF issued a press release, which Costello drafted, announcing that it had signed "strategic non-binding letters of intent" to acquire ten financial services and hemp and cannabis companies. The press release asserted that the intended acquisitions would "result in the acquisition of a significant amount of assets" and cause GRNF to cease being a shell company.

34.    The press release described "Pacific Banking Corp." as one of the entities with which GRNF had signed a strategic non-binding letter of intent and stated that Pacific Banking Corp. provided "specialized banking services" to its clients. Pacific Banking Corp. is majority-owned by Costello.

35.    The press release omitted that Pacific Banking Corp. is not registered as a state or federal bank, or as a money services business.

36.    Costello knew or recklessly disregarded that the statements in the press release about Pacific Banking Corp. were false or misleading.

37.    GRNF's stock, which opened at $0.845 on November 12, 2019, the day of the press release, reached an intraday high of $0.98—an approximately sixteen percent increase—before closing at $0.89.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

## II.     Costello Defrauded Two Advisory Clients and Engaged in Insider Trading

38.     In July 2019, Costello became an investment adviser to a 65-year-old real estate agent ("Advisory Client 1") and her husband, a 68-year-old retiree ("Advisory Client 2") (together, "the Advisory Clients").

39.     As their investment adviser, Costello owed a fiduciary duty to act in the best interest of the Advisory Clients at all times. Costello breached that duty in numerous ways.

### A.     Costello Made Materially False Statements to the Advisory Clients, Failed to Act in the Best Interest of the Advisory Clients, and Failed to Make Full and Fair Disclosure of Conflicts of Interest

40.     Costello first met the Advisory Clients in January 2019. Costello made numerous misrepresentations to them concerning his background, including that he is the youngest hedge fund billionaire ever, that he has an MBA from Harvard University, that he is licensed to manage money and investments, and that he had served in the military with the Special Forces.

41.     These false credentials led the Advisory Clients to hire Costello to manage their joint brokerage account ("Brokerage Account A").

42.     On July 14, 2019, the Advisory Clients opened Brokerage Account A and funded Brokerage Account A with $4,000,600.

43.     On July 20, 2019, the Advisory Clients signed a "Trading Authorization Form" that designated Costello as their authorized agent. The Advisory Clients agreed to pay Costello twenty percent of the profits in Brokerage Account A. Costello told the Advisory Clients that he was waiving his typical two percent management fee as a "friends and family" discount.

44.     The Advisory Clients provided Costello with discretion over, and full access to, Brokerage Account A. Costello accessed Brokerage Account A electronically using Advisory Client 1's username and password. The Advisory Clients did not direct or execute any trades in Brokerage Account A.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

45. Costello told Advisory Client 1 not to sign into Brokerage Account A while he was signed into the account. He also instructed Advisory Client 1 that, if contacted by Brokerage Firm A, she should falsely state that she placed all trades in the account and that she should ask the brokerage firm not to restrict her account in response to any trading activity.

46. Although Costello had offered to develop a diverse financial portfolio for the Advisory Clients, all of the investments in Brokerage Account A were in microcap companies that Costello controlled or in which he personally invested.

47. For example, Costello purchased 555,000 common shares and 250,000 preferred shares of Canal Capital Corporation ("Canal Capital"), for a total purchase price of over $80,000, in Brokerage Account A. Canal Capital was a shell company that Costello was directing others to promote on Twitter and whose stock Costello had purchased in his own account.

48. On November 1, 2019, the Commission suspended trading in Canal Capital's common and preferred stock. Prior to the announcement of the trading suspension, Costello had sold over 489,000 shares of Canal Capital preferred stock in his own account for over $109,000 in profits. Costello, who did not disclose this trading to the Advisory Clients, did not sell any of the Canal Capital stock that he had purchased in Brokerage Account A on their behalf.

**B. Costello Engaged in Insider Trading in Brokerage Account A**

49. Costello also used Brokerage Account A to purchase and sell GRNF stock while he was the CEO and controlling shareholder of the company and in possession of material, nonpublic information.

50. As GRNF's CEO and controlling shareholder, Costello had a fiduciary duty and other relationship of trust with GRNF and its shareholders that obligated him not to trade on GRNF's information for his personal benefit.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

51.     In fact, Costello knew that he should not purchase any GRNF stock on the open market because he was an insider with material, nonpublic information about the future plans of the company and, given his access to this information, purchasing stock may violate the securities laws.

52.     Nevertheless, Costello purchased over 670,000 shares of GRNF stock in Brokerage Account A in advance of a July 22, 2019, Form 8-K filing announcing that GRNF would change its name from "Discovery Gold Corporation" to "GRN Holding Corporation" and would request to change its trading symbol accordingly.

53.     The information contained in the July 22, 2019 Form 8-K was material because it signaled to investors that GRNF was taking actual steps toward becoming a purported cannabis conglomerate. GRNF's share price increased 137 percent on the day the Form 8-K was issued.

54.     The information contained in the July 22, 2019 Form 8-K was nonpublic because, prior to the filing, it was not broadly disseminated to the investing public.

55.     Between July 22 and July 25, 2019, Costello sold the GRNF shares he had acquired in Brokerage Account A for approximately $150,000 in profits. Costello included these profits in an invoice that he sent to the Advisory Clients, who paid him twenty percent of the realized profits on Costello's trading of GRNF in Brokerage Account A.

56.     Based on their agreement with Costello, the Advisory Clients made two payments to Costello totaling $37,916.05, including for twenty percent of the profits from the purchase and sale of GRNF stock.

57.     In October 2019, Brokerage Firm A informed the Advisory Clients that it had decided to end its business relationship with them.

COMPLAINT
SEC V. COSTELLO ET AL.

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

58.     At Costello's instruction, the Advisory Clients thereafter opened Brokerage Account B at a different brokerage firm and transferred approximately $1.27 million from Brokerage Account A to Brokerage Account B.

59.     Like with Brokerage Account A, the Advisory Clients gave Costello full authority over the new brokerage account at Brokerage Firm B, in which Costello continued to trade microcap companies on the Advisory Client's behalf until approximately February 2020.

60.     At the end of October 2019, the securities remaining in Brokerage Account A were valued at approximately $2.9 million. By the end of April 2020, the month before the Advisory Clients began to liquidate the stocks Costello had purchased in Brokerage Account A, the value of those securities had declined by approximately 65 percent.

61.     At the end of February 2020, the securities in Brokerage Account B were valued at approximately $299,700. As of the end of June 2022, the value of those securities had declined by approximately 97 percent.

**C.     Costello Defrauded the Advisory Clients in Connection with the Sale of GRNF Stock**

62.     Around the time that the Advisory Clients hired Costello to manage Brokerage Account A, the Advisory Clients also agreed to purchase nine million shares of GRNF stock directly from Costello for $1.8 million (*i.e.*, $0.20 per share).

63.     This $1.8 million purchase price represented a markup by Costello of over 9,000 percent from the price of $0.002 per share that Costello had paid for those same shares of GRNF stock the previous month.

64.     Costello failed to fully and fairly disclose to the Advisory Clients that he had acquired his shares of GRNF stock for $0.002 per share and that the $1.8 million purchase price reflected a markup of over 9,000 percent.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

65.     On July 23, 2019, the Advisory Clients paid for the shares by a cashier's check written to GRN Funds.

66.     In approximately April 2020, after numerous requests, Costello sent to the Advisory Clients what purported to be share certificates reflecting their ownership of 9.5 million shares of GRNF stock.

67.     In approximately October 2020, Costello directed GRNF to issue nine million shares of GRNF stock to the Advisory Clients. Although the share purchase agreement for those shares was between the Advisory Clients and GRN Funds, Costello directed that new shares be issued by GRNF rather than transferring the shares he owned through GRN Funds and purportedly sold to the Advisory Clients.

68.     Despite having instructed GRNF to issue new shares to the Advisory Clients rather than transferring GRN Funds's shares to the Advisory Clients, Costello never transferred the $1.8 million the Advisory Clients paid for the stock to GRNF.

**III.    Costello Obtained Approximately $700,000 from the Sale of GRN Holding (WA) Stock Based on Misrepresentations**

69.     From at least July to November 2019, Costello solicited the Advisory Clients and 11 other investors to invest in a "family and friends" share offering for GRN Holding (WA).

70.     Although GRN Holding (WA) shares the "GRN Holding Corporation" name with the publicly traded GRNF, it is a separate, private company incorporated by Costello in a different state and initially owned solely by Costello.

71.     Costello misled investors in GRN Holding (WA) to believe, however, that they were receiving shares of the publicly traded GRNF entity.

72.     For example, Costello sent the Advisory Clients the subscription agreement for their investment in GRN Holding (WA) in the same email in which he sent the share purchase

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

agreement for the nine million shares of GRNF. The subject line of the email was simply "Subscription Agreement and Common Shares," and in his email Costello did not differentiate between the two entities.

73. Another investor ("Investor 1") expressed to Costello that he and his father ("Investor 2") were interested in investing in GRNF after seeing the performance of the publicly traded GRNF stock. Costello offered Investor 1 and Investor 2 a "friends and family" deal if they each invested $25,000. When Costello sent Investor 1 and Investor 2 the subscription agreement for their investments, however, Costello did not differentiate between GRNF and the entity in which Investor 1 and Investor 2 would actually be investing.

74. Like the Advisory Clients, other investors in GRN Holding (WA) also believed that Costello was a billionaire with a Harvard MBA, a military veteran, and experienced in the financial industry. These investors also believed that Costello owned legitimate, revenue-generating businesses that could potentially be merged into GRNF.

75. For example, Costello emailed Investor 1 and Investor 2 information about his purported "banking program" at Pacific Banking Corp. The materials described Pacific Banking Corp. as providing "safe, secure & compliant cannabis banking." As alleged above, Pacific Banking Corp. was not registered to conduct business as a bank or money services business.

76. In total, Costello obtained approximately $700,000 in investments for GRN Holding (WA) from 13 investors, including $250,000 from the Advisory Clients and $25,000 from each of Investor 1 and Investor 2.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

## IV. Costello Obtained Approximately $200,000 from the Sale of Hempstract Stock Based on Misrepresentations and then Misappropriated a Portion of the Funds

77.     Beginning in at least January 2020, Costello began purchasing shares of RVDO on the open market. Costello planned to merge Hempstract, a private company that he co-owned, into RVDO.

78.     Costello made misrepresentations to secure investments for Hempstract.

79.     For example, in approximately March 2020, Costello made a presentation to potential investors, pitching an opportunity to purchase shares of Hempstract before it became a public company. During that meeting, Costello falsely stated that he had sixteen years of investment banking experience on Wall Street, that he was a banker in the cannabis industry who managed money for over 400 clients, and that he had over a billion dollars of equity in his own fund. Each of those representations was false.

80.     Costello also told potential investors that any shares they purchased would be restricted from trading for six months, at which point they could sell their shares through a brokerage account. However, because RVDO was a shell company that was not an SEC-reporting company, any shares of RVDO would be required to be held for one year.

81.     In total, between March and August 2020, Costello obtained approximately $200,000 in investments for Hempstract from 19 investors. Of that amount, checks for approximately $50,000 from four investors were written to, and deposited in, a bank account for a separate entity controlled by Costello. Costello never transferred the funds he received for the four investors' investments in Hempstract.

## V. Costello and Ferraro Engaged in Stock Promotion Schemes

82.     Costello and Ferraro met in mid-2019. Ferraro was a GRNF investor who had posted about the company on various investor message boards.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

83.     Ferraro controlled a Twitter account with the handle "@computerbux" that at one point had over 10,000 followers. Ferraro posted at least 7,900 tweets in 2019 and at least 5,000 tweets from January through June 2020. Nearly 90 percent of these tweets referenced a specific stock or stocks.

84.     Costello and Ferraro used Ferraro's Twitter account to perpetrate at least five stock promotion schemes (each a "Stock Promotion Scheme" and collectively, the "Stock Promotion Schemes"). In each Stock Promotion Scheme, Ferraro recommended a penny stock that he and/or Costello owned to Ferraro's Twitter followers and the public. As he wrote in a January 2020 email to Costello summarizing their schemes, Ferraro understood that his "announce[ments]" on Twitter would cause the stock to "run[ ] on hype," *i.e.*, cause the stock price to increase. In his promotional tweets, Ferraro did not disclose that he and/or Costello intended to sell their own holdings of those stocks into the inflated market that Ferraro's tweets helped create. Ferraro also did not disclose that Costello had agreed to pay Ferraro a portion of Costello's profits from certain of the Stock Promotion Schemes.

## A.     The Canal Capital Corporation ("Canal Capital") Stock Promotion Scheme

85.     On October 7, 2019, Costello learned from an investor in Canal Capital, a defunct company, that former executives at Canal Capital had agreed to sell their shares of Canal Capital to the investor. Without that investor's knowledge, on that day Costello began buying shares of Canal Capital on the open market, and by October 10, 2019, Costello had accumulated over one million shares of Canal Capital common stock ("COWP") and over 740,000 shares of Canal Capital preferred stock ("COWPP").

86.     Costello messaged Ferraro: "COWP and COWPP attack it hard [I] have 70% of float already." Float refers to the total number of shares of a stock that are available for public investors to buy and sell.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

87.     On October 10, 2019, Ferraro began to purchase shares of Canal Capital stock in his brokerage account.

88.     On October 10, 2019, Ferraro began to promote Canal Capital on Twitter, and would ultimately tweet about Canal Capital at least 270 times over the next three weeks. Ferraro's promotional tweets included (i) October 10, 2019 posts that "[Costello] owns 70% and believes it will be a Michigan Avenue dispensary" and that he was "betting over 1000% gains" for COWPP, (ii) October 17, 2019 tweets that "new highs [are] coming" for COWP and COWPP and that "[t]his is your shot … time is of the essence," and (iii) an October 22, 2019 tweet that COWPP is "[l]ooking like it's gearing for a 700% - 1000% run."

89.     At no point did Ferraro disclose that he or Costello were selling Canal Capital stocks during this time period.

90.     Ferraro's tweets coincided with significant increases in the share price and trading volume in COWP and COWPP, and the Commission ultimately suspended trading in Canal Capital securities on November 1, 2019.

91.     Prior to the institution of the trading suspension, Costello sold over 489,000 shares of COWPP for over $109,000 in profits. Ferraro profited approximately $41,000 from his own trading.

**B.      The Foothills Exploration, Inc. ("FTXP") Stock Promotion Scheme**

92.     On December 9, 2019, Costello acquired over 7.6 million shares of FTXP. That day, the stock closed at $0.007 per share.

93.     That evening, Costello messaged Ferraro about Ferraro promoting FTXP, and Costello agreed to share 30 percent of his profits with Ferraro.

94.     Costello instructed Ferraro to wait until 10 a.m. the next day because he planned to purchase additional shares.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

95. On the evening of December 9, Ferraro teased the following in a tweet: "I have a MASSIVE MASSIVE MASSIVE stock to announce with a PERFECT chart. Stay tuned. Announcement tomorrow morning!!!!!!"

96. At 9:23 a.m. on December 10, Ferraro asked Costello what "central theme" could be used to promote FTXP. Costello replied at 9:41 a.m., writing only: "Large reserves."

97. In the meantime, at 9:32 a.m., Ferraro tweeted that "[t]he new stock I'm calling at 10 am has a 90% [chance] of being a 60 bagger within 30 days. That's 6,000% gain friends!"

98. At 9:44 a.m., after confirming with Costello that he should start tweeting, Ferraro tweeted: "The huge 60 bagger call is $FTXP!!!!!!!!!!!!!!!!!!!!!! The word on the street is they hit the motherlode!!!!!!! Huge reserve found and they got it all! And the actual public float around 2M shares!!!"

99. Ferraro would go on to post at least 90 promotional tweets about FTXP on December 10—including, for example, "$FTXP A hedge I know owns 5M of this" and "$FTXP On the verge of a MAJOR MAJOR MAJOR breakout!!!!!!!!!!"—and over 100 additional tweets over the next two weeks. FTXP's stock price closed at $0.0273 on December 10, a 290 percent increase over the prior day's close, and reached an intraday high of $0.0465 on December 11.

100. At no point did Costello or Ferraro disclose that Costello was selling FTXP stocks during this time period or that Ferraro would receive a share of Costello's profits.

101. Costello, who began selling his shares of FTXP shortly after Ferraro began tweeting about FTXP, sold his entire position by December 13, 2019 for profits of approximately $113,000. Costello shared over $23,000 of those profits with Ferraro.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

### C. The REMSleep Holdings, Inc. ("RMSL") Stock Promotion Scheme

102.     On December 13, 2019, Costello acquired over 4.5 million shares of RMSL, and its stock closed at $0.02 that day. Costello purchased an additional 121,000 shares of RMSL on the morning of December 16.

103.     Also on the morning of December 16, Costello messaged Ferraro to share his position: "RMSL. In for 4 mil total." Ferraro replied that he would "start researching for noon so I have a story to tell."

104.     At 10:57 a.m. on December 16, Ferraro tweeted: "T minus 1 hour and 4 minutes…."

105.     At noon, referencing a predicted 1,000 percent gain, Ferraro tweeted: "And the huge 10 bagger is……. $RMSL !!!!!!!!!!!!!!!!!!!!!!! $RMSL has entered the VERY LUCRATIVE Sleep apnea medical device market!!! They put out PR's regularly. They should have a market cap over $10M!!! The chart is screaming for a massive run up!!!!"

106.     Ferraro ultimately posted at least 100 tweets on December 16 and over 200 additional tweets over the next two weeks promoting RMSL. RMSL's stock price reached an intraday high of $0.0368 on December 16 and closed at $0.031 that day, a 55 percent increase over the prior day's close.

107.     At no point did Costello or Ferraro disclose that Costello was selling RMSL stocks during this time period or that Ferraro would receive a share of Costello's profits.

108.     Costello began selling his shares of RMSL shortly after Ferraro began tweeting about RMSL on December 16, and sold his entire position by December 19 for profits of approximately $64,000. Costello shared $9,100 of those profits with Ferraro.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

**D.     The Clancy Systems International ("CLSI") Stock Promotion Scheme**

109.     From October 3 through October 7, 2019, Costello accumulated over 600,000 shares of CLSI.

110.     On October 7, Ferraro began promoting CLSI, tweeting that it was "Looking hot" and that it "looks prime." On October 8, he tweeted a predicted CLSI share price increase "on news."

111.     Also on October 7, Costello began selling his CLSI shares. He sold his entire CLSI position on October 7 and October 8, profiting approximately $13,000.

112.     Costello began buying CLSI shares again in January 2020, and by the end of the month he held over 4.2 million shares. On February 5, 2020, Costello purchased an additional 75,000 shares of CLSI.

113.     On Friday, February 7, Costello messaged Ferraro: "Took a large position in [CLSI] 2 mil today if you want to run it. … Buying more of [CLSI] on monday." Three minutes later, Ferraro responded: "I'll start on it now." Shortly thereafter, Ferraro tweeted that CLSI "looks like a good bet big time," and later that day, Ferraro tweeted that CLSI "might be one of the biggest of the year."

114.     Ferraro's promotional tweeting about CLSI continued in the ensuing days, including tweets on February 13 that his followers should "TRUST THE BUX" and "LOAD HEAVY" and on February 18 that CLSI "is going to be a 10 bagger :)."

115.     In total, from February 10 through February 19, Ferraro posted over 180 tweets promoting CLSI. At no point did Costello or Ferraro disclose that Costello was selling CLSI stocks during this time period.

116.     Costello sold all of his CLSI shares from February 10 through February 19, generating profits of approximately $29,000.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

### E. The RVDO and HPST Stock Promotion Scheme

117. In February and March 2020, Costello accumulated nearly 2 million shares of RVDO.

118. On March 26, 2020, Ferraro wrote to Costello: "RVDO ?" Costello responded: "Accumulate don['t] post."

119. On March 26, Ferraro also messaged another investor: "Let's keep the RVDO tweets to zero till filings. . . . It doesn't have filings for six years and I don't want to give the SEC a reason to suspend trading until the financials are filed and it gets current."

120. On April 23, 2020, RVDO posted quarterly and annual reports for periods in 2016 through 2019 on the OTC Link website.

121. On April 28, RVDO announced that it had signed a strategic non-binding letter of intent with Hempstract.

122. Also on April 28, Ferraro began a months-long promotional campaign of RVDO on Twitter. His tweets included, for example, a post on April 29 that "[RVDO] is one you'll want to accumulate for sure."

123. On May 20, 2020, Ferraro tweeted, regarding RVDO: "BIG. THINGS. HAPPENING." On May 21, Ferraro tweeted that RVDO bidders "better move those bids up!" because "NEWS IS COMING" and "Ain't nobody selling."

124. That same day, May 21, Costello began selling his RVDO shares. Through RVDO sales he made from May 21 through June 8, Costello profited approximately $314,000. During that period, Ferraro promoted RVDO in over 250 tweets. In total, from April through July 2020, Ferraro posted a total of over 1,300 tweets promoting RVDO.

125. Ferraro continued to post about RVDO on his Twitter account throughout the remainder of 2020 and into 2021, including after RVDO changed its ticker symbol to HPST.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

126. In early January 2021, Ferraro's tweets about HPST included, on January 4, "$HPST Time for the hell yes" and, on January 5, "$HPST Float lock status is looking reallllllllly close" and "$HPST Accumulation increasing. Shares getting scarce IMO." On January 5, Ferraro also shared a HPST press release announcing that the company had purportedly completed the extraction process on over 36,000 pounds of raw hemp, tweeting, "$HPST That's about a $10M contract for the first one.......WOW!!!!!!!" and "$HPST I'm betting we see a supplemental PR with numbers :)."

127. On January 6, 2021, Costello sold over 70,000 shares of HPST, generating profits of approximately $41,000.

128. At no point did Costello or Ferraro disclose that Costello was selling RVDO or HPST stocks during these time periods.

## VI. Ferraro Separately Engaged in Stock Promotion Schemes

129. Ferraro also engaged in his own Stock Promotion Schemes in July 2019, December 2019, and January 2020, generating profits of approximately $68,000.

### A. The Powerdyne International Inc. ("PWDY") Stock Promotion Scheme

130. From July 12 through July 24, 2019, Ferraro purchased over 25 million shares of PWDY, a stock he had lightly traded and tweeted about during the prior month.

131. From July 25 through July 29, Ferraro posted at least 70 promotional tweets about PWDY. These tweets included "$PWDY Is about to explode" on July 25, "$PWDY … to triple in value in the next 5 trading days IMO," the following day, and, on July 29, "$PWDY is about to breakout!"

132. At no point did Ferraro disclose that he was selling PWDY stocks during this time period.

COMPLAINT
SEC V. COSTELLO ET AL.

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

133. Ferraro sold his entire PWDY from July 25 through July 29. His profits from this trading activity were approximately $47,000.

**B.    The South Beach Spirits ("SBES") Stock Promotion Schemes**

134. From December 3 to December 5, 2019, Ferraro purchased 4.7 million shares of South Beach Spirits ("SBES") at prices ranging from $0.0038 to $0.0047 per share. During this time, he tweeted about a potential "breakout" for the stock.

135. On December 6, Ferraro tweeted: "$SBES My wall street friends say that there is a deal in the works that will bring this well over $2. Very interesting indeed." On that day he again touted a potential "breakout" for SBES, and tweeted that "I think $.08 is a good initial target that will be hit easily."

136. By December 9, Ferraro had sold all of his SBES shares, primarily through the sale of 4.5 million shares on December 9 at share prices ranging from $0.0075 to $0.0081. In total, from December 3 through December 9, Ferraro posted a total of 39 promotional tweets about SBES. These included a tweet on the evening of December 8, shortly before he sold the bulk of his position, that "I saw there is a second $10B opportunity for this year in $SBES."

137. At no point did Ferraro disclose that he was selling SBES stocks during this time period.

138. Ferraro profited approximately $16,000 from his trading in SBES from December 3 through December 9.

139. From January 17 to January 22, 2020, Ferraro again acquired a position in SBES, this time purchasing 2.5 million shares at share prices ranging from $0.0091 to $0.0102.

140. During this time, Ferraro tweeted that "filings [are] expected" for SBES and a "breakout" was coming.

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

141. Ferraro then sold all of his shares on January 24, 2020, while posting at least 35 promotional tweets about SBES. These tweets included a prediction that "$SBES will announce something" and "news and filings will take it [to] dollar land," and urging his followers to "[g]et in BEFORE the filings."

142. At no point did Ferraro disclose that he was selling SBES stocks during this time period.

143. Ferraro's January 24 sales of SBES were made at share prices ranging from $0.0100 to $0.0132, for total profits of approximately $5,000.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Both Defendants)

144. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 143.

145. Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, have (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

146. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Both Defendants)

147.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 143.

148.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have: (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

149.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)
### (Costello)

150.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 143.

151.    At all relevant times, Defendant Costello was an investment adviser under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

152.    Defendant Costello, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (1) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (2)

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

153.    By reason of the foregoing, Defendant Costello, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**PRAYER FOR RELIEF**

154.    WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

155.    Permanently enjoining Costello and his agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Advisers Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

**II.**

156.    Permanently enjoining Ferraro and his agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**III.**

157.    Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations pursuant to

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

Exchange Act Sections 21(d)(3) [15 U.S.C. § 78u(d)(3)], 21(d)(5) [15 U.S.C. § 78u(d)(5)], and 21(d)(7) [15 U.S.C. § 78u(d)(7)];

**IV.**

158.    Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Sections 21(d)(3) [15 U.S.C. § 78u(d)(3)] and 21A [15 U.S.C. §§ 78u-1(a)(1)-(2)], and Advisers Act Section 209(e) [15 U.S.C.§ 80b-9(e)];

**V.**

159.    Permanently prohibiting Costello from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**VI.**

160.    Permanently prohibiting Defendants from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100

**VII.**

161.    Granting any other and further relief this Court may deem just and proper.

Dated: September 29, 2022

Respectfully submitted,

*s/ Pascale Guerrier*
Pascale Guerrier
    Conditionally Admitted Pursuant to LCR
    83.1(c)(2)
Samuel Kalar
    Conditionally Admitted Pursuant to LCR
    83.1(c)(2)
Tiantong Wen
    Conditionally Admitted Pursuant to LCR
    83.1(c)(2)
Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100
Email: guerrierp@sec.gov

*Attorneys for Plaintiff Securities and
Exchange Commission*

COMPLAINT
*SEC V. COSTELLO ET AL.*

Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-1100